UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION
2018 DEC -4 AM 11: 19
SOUTHERN DISTRICT
OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF INDIANA, *ex. rel.* BRADLEY A. STEPHENS,<br>*Plaintiffs*,<br><br>v.<br><br>HOPEBRIDGE, LLC.<br>*Defendant* | 1:18-cv-3804-JPH-MPB<br><br>CAUSE NO.:<br><br>FILED UNDER SEAL<br>PURSUANT TO 31 U.S.C. §3730(b)(2)<br><br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER** |

**FALSE CLAIMS ACT COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

1. Relator Bradley Stephens (hereinafter "Stephens" or "Relator") brings this *qui tam* action on behalf of himself, The United States of America, and The State of Indiana against HopeBridge, LLC. This is an action pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* (hereinafter "FCA") and the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5-7 *et seq.* (hereinafter "IFCA") to recover damages and civil penalties from false claims presented to the United States of America and the State of Indiana by the Defendants. The violations alleged herein arise out of HopeBridge's billing for, and failure to repay funds, attributable to services not actually provided, the double-billing of services, and provision of inadequate services.

2. As required by Ind. Code § 5-11-5.5-4(C) and 31 U.S.C. § 3730(a)(2), Stephens has provided the Attorney General of the United States, the Attorney General for the State of Indiana, the United States Attorney for the Southern District of Indiana, and the Department of Justice, a statement of all material evidence and information known to Stephens at filing

1

establishing the existence of the Defendants' fraudulent behavior. That information and evidence was previously unknown to the United States of America and the State of Indiana.

3. This action is not based upon information contained in any of the sources enumerated in Ind. Code § 5-11-5.5-7(f)(1)-(3).

4. To the extent, if any, that the allegations or transactions set forth herein are the subject of a civil suit or an administrative civil money penalty proceeding in which the State of Indiana or the United States of America is already a party, if any such proceeding exists, then the allegations stated herein which are the subject of any such civil suit or administrative civil money penalty proceeding are expressly excluded, but only for the specific time periods, locations, and/or allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

5. The Relator has direct and independent knowledge of the information that is the basis of this action, and voluntarily provides this information to the United States of American and the State of Indiana.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (conferring federal subject matter jurisdiction), 28 U.S.C § 1345 (United States as Plaintiff) and 31 U.S.C. § 3732 (conferring jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3720 and § 3732).

7. This Court has personal jurisdiction over HopeBridge pursuant to 31 U.S.C. § 3732(a) and because acts prohibited by 31 U.S.C. § 3729 have occurred in this District.

8. Venue is proper pursuant to 31 U.S.C. § 3732(a) because HopeBridge can be found, resides, and transacts business in the Southern District of Indiana.

9. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

## PARTIES

10. Relator is a citizen of the State of Indiana acting on behalf of the State of Indiana under the authority granted by the IFCA, Ind. Code § 5-11-5.5-4(a), and the United States of America under the authority granted by the FCA.

11. Relator brings this action on behalf of the State of Indiana and the Office of Medicaid Policy and Planning, a division of the Indiana Family and Social Services Administration, which administers the Indiana Health Coverage Program (IHCP or Indiana Medicaid).

12. Relator also brings this action on behalf of the United States of America by and through the Department of Health and Human Services.

13. Defendant HopeBridge is an Indiana limited liability company engaged in the provision of various healthcare services, with headquarters at 3500 DePauw Blvd., Suite 320, Indianapolis, IN 46236.

14. In just thirteen (13) years, HopeBridge has expanded to become one of the top five largest ABA therapy services companies in the United States, and is the fastest growing company of its kind.

15. In the last two years alone, HopeBridge has opened fourteen (14) new centers across the Midwest.

16. HopeBridge has fifteen (15) locations in Indiana including Carmel, Terre Haute, Richmond, Indianapolis (2), Greenwood, South Bend, Merrillville, Marion, Lafayette, Kokomo, Fort Wayne, Bloomington, Evansville, and Jeffersonville.

17. HopeBridge has 14 centers in three other states, including Illinois and Georgia.

18. HopeBridge is enrolled as an IHCP provider, has entered an ICHP Provider Agreement, and routinely bills Indiana Medicaid for the services it provides to IHCP members.

## STATUTORY AND REGULATORY BACKGROUND

### False Claims Act

19. The FCA, 31 U.S.C. § 3729 *et. seq.* reflects Congress's desire to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266. As relevant here, the FCA established civil penalties and treble damages liability to the United States for an individual or entity that: knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G)

20. "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference to the truth and falsity of the information. *Id.* *See also* U.S. v. Bourseau, 531 F.3d 1159, 1168 (9th Cir. 2008) ("In defining knowingly, Congress attempted to reach what has become known as the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted").

21. The Indiana Medicaid False Claims and Whistleblower Protection Act (IFCA) prohibits knowingly presenting, or causing to be presented a false or fraudulent claim for payment or approval of state funds. Ind. Code § 5-11-5.7-2(a)(1).

22. The IFCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. Ind. Code § 5-11-5.7-2(a)(2).

23. The IFCA prohibits knowingly concealing or improperly avoiding or decreasing an obligation to pay or transmit federal funds. Ind. Code § 5-11-5.7-2(a)(6)(B).

24. For purposes of the IFCA the term "knowingly mean[s] that a person has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information; and requires no proof of specific intent to defraud[.]" Ind. Code § 5-11-5.7-1(a)(4).

25. The IFCA provides that defendants who commit violations of the FCA described in paragraphs 21, 22, 23 of this Complaint are liable for "3 times the amount of damages which the Government sustains because of the act of that person" and for a civil penalty of not less than $5,500 and not more than $11,000 per false claim and the costs of a civil action brought to recover any such penalty or damages. Ind. Code § 5-11-5.7-2(a); Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461 note; Public Law 101-410; 64 Fed. Reg. 47,099, 47,103 (1999).

**The Indiana Health Coverage Program**

26. Title XIX of the Social Security Act was enacted by Congress to establish the Medicaid Program. See 42 U.S.C. 1396-1396(v). Medicaid is funded by both federal and state money, with the federal contribution capsulated separately for each state. *See* 42 U.S.C. 1396(d) & 1396(D)(b).

27. The Centers for Medicaid and Medicaid Services ("CMS") is an agency of the Department of Health and Human Services ("DHS") and is directly responsible for the federal implementation of Medicaid.

28. The State of Indiana implemented its Medicaid program pursuant to a state plan approved under Title XIX of the Social Security Act.

29. Medicaid in the State of Indiana is called the Indiana Health Coverage Program (IHCP or Indiana Medicaid), and is administered by the Office of Medicaid Policy and Planning, a division of the Indiana Family and Social Services Administration (FSSA).

30. Within broad federal rules, Indiana Medicaid decides eligibility, the services covered, payment levels for services, and administrative and operational procedures. Indiana Medicaid directly pays providers, and obtains the federal share of the payment from United States Treasury funds.

30. Under Indiana Code § 12-15-1-10, the Indiana Secretary of the FSSA may adopt rules to implement the Medicaid program. Pursuant to this authority, the Secretary has promulgated rules to require compliance by all enrolled providers with Medicaid program provisions.

31. Under Indiana Code § 12-15-11-2, medical providers who wish to provide covered services to Medicaid patients must execute a Provider Agreement.

32. Under the Provider Agreement, a provider, together with its authorized agents, employees and contractors, are required to comply with all federal and State of Indiana statutes and regulations pertaining to Medicaid, the IHCP Provider Manual, and all bulletins and notices communicated to the provider.

33. Thus, as a condition of enrollment, HopeBridge has "certif[ied] that any and all

6

information contained on any IHCP billings submitted on [its] by electronic, telephonic, mechanical, and/or standard paper means of submission [are] true, accurate, and complete. *Id.*

34. As a further condition of enrollment, HopeBridge has agreed "to accept as payment in full the amounts determined by the FSSA or its fiscal agent, in accordance with federal and state statutes and regulations as the appropriate payment for IHCP covered services provided to IHCP members (recipients)." *IHCP Rendering Provider Agreement*

35. As a further condition of enrollment, HopeBridge has agreed "not to bill members, or any member of a recipient's family, for any additional charge for IHCP-covered services, excluding any co-payment permitted by law." *Id.*

### ABA Therapy

36. Applied behavior analysis ("ABA"), and ABA therapy, is the process of systematically applying interventions based upon the principles of learning theory to improve socially significant behaviors to a meaningful degree, and to demonstrate that the interventions employed are responsible for the improvement in behavior (Baer, Wolf & Risley, 1968; Sulzer-Azaroff & Mayer, 1991).

37. "Socially significant behaviors" include reading, academics, social skills, communication, and adaptive living skills. Adaptive living skills include gross and fine motor skills, eating and food preparation, toileting, dressing, personal self-care, domestic skills, time and punctuality, money and value, home and community orientation, and work skills.

38. ABA methods are used to support persons with autism in several ways: to increase behaviors (e.g. reinforcement procedures increase on-task behavior, or social interactions); to teach new skills (e.g., systematic instruction and reinforcement procedures teach functional life skills, communication skills, or social skills); to maintain behaviors (e.g.,

teaching self-control and self-monitoring procedures to maintain and generalize job-related social skills); to generalize or to transfer behavior from one situation or response to another (e.g., from completing assignments in the resource room to performing as well in the mainstream classroom); to restrict or narrow conditions under which interfering behaviors occur (e.g., modifying the learning environment);and to reduce interfering behaviors (e.g., self-injury or stereotypy).

39. On February 6, 2016, ABA therapy services became a "covered service" eligible for reimbursement from Indiana Medicaid when rendered by an approved provider.

40. ABA therapy services are primarily overseen or rendered by Board Certified Behavioral Analysts (BCBAs) and Registered Behavior Technicians (RBTs).

41. The State of Indiana does not currently provide licensing or regulatory oversight of BCBAs or RBTs.

42. Thus, BCBAs and RBTs are paraprofessionals licensed by the Behavior Analyst Certification Board, a nonprofit 501(c)(3) corporation established to meet professional credentialing needs identified by Behavior Analysts, governments, and consumers of behavior analysis services.

43. The formal training of BCBAs is similar to that of other medical and behavioral health professionals. That is, they are initially trained within academia and then begin working in a supervised clinical setting with clients. As they gradually demonstrate the competencies necessary to manage complex clinical problems across a variety of clients and medical environments, they become independent practitioners.

44. In March of 2018, Medicaid approved BCBAS to utilize their own NPI numbers

8

and become the "rendering provider" for billing purposes. Previously, the rendering provider needed to be a physician.

45. The RBT is primarily responsible for the direct implementation of behavior-analytic services. The RBT does not design intervention or assessment plans. It is the responsibility of the RBT supervisor (most often a BCBA) to determine which tasks an RBT may perform as a function of his or her training, experience, and competence.

46. The BCBA supervising the RBT is responsible for the work performed by the RBT on the cases they are overseeing.

47. The process of receiving/providing ABA therapy services begins with the receipt of an Order from the patient's treating physician.

48. The Order indicates the patient has the necessary medical need to receive the services.

49. Once an order is obtained, a BCBA does an initial assessment (identified and billed as Procedure Code 96150 U1) to determine the patients' needs and crafts what is otherwise known as a plan of treatment or plan of care (hereinafter, "PoC").

50. FSSA provides the following description of Procedure Code 96150 U1: "Health and behavior assessment (eg, health focused clinical interview, behavioral observations, psychophysiological monitoring, health-oriented questionnaires), each *15 minutes* face-to-face with the patient; *initial assessment*; ABA therapy assessment provided by BCBA, BCBA-D, or HSPP."

51. For the provision of services identified as Procedure Code 96150 U1 to IHCP members, Indiana Medicaid compensates providers Sixteen and 88/100 Dollars ($16.88) per unit of service rendered.

52. Once completed, the PoC is returned to the treating physician with diagnostic results for signature.

53. The PoC and diagnostic results are then submitted to Indiana Medicaid so to obtain Prior Authorization (PA).

54. The PA process includes a review performed by Indiana Medicaid, or its agents, to assure medical necessity.

55. An initial assessment (identified and billed as Procedure Code 96150 U1) does not require Prior Authorization (PA).

56. A PA encompasses all needed treatment units and parent training (as set forth in the PoC) for six month intervals unless treatment is determined to terminate sooner.

57. Providers are thereafter required to adhere to the PoC.

58. At the end of a six month interval of services provided in a PA, should additional services be required, a re-assessment (identified and billed as Procedure Code 96151 U1) is need to obtain a PA for the subsequent six month interval of services.

59. A re-assessment often includes biopsychosocial information, an evaluation of current strengths and skill deficits, individualized treatment goals, a plan for parent/caregiver training, and a discussion about items related to the coordination of care.

60. The completion of a re-assessment is relatively lengthy process that would never be appropriately performed on a weekly basis.

61. FSSA provides the following description of Procedure Code 96151 U1: "Health and behavior assessment (e.g., health focused clinical interview, behavioral observations, psychophysiological monitoring, health-oriented questionnaires), *each 15 minutes* face-to-face

with the patient; *re-assessment*; ABA therapy assessment provided by BCBA, BCBA-D, or HSPP."

62. For the provision of services identified as Procedure Code 96151 U1 to IHCP members, Indiana Medicaid compensates providers Sixteen and 31/100 Dollars ($16.31) per unit (15 minutes) of service rendered.

63. Following the start of ABA therapy services, the majority of direct care and contact with a patient is, at all times relevant herein, provided by an RBT and identified as Procedure Code 96153 U3.

64. FSSA provides the following description of Procedure Code 96152 U3: Health and behavior intervention, *each 15 minutes*, face-to-face; individual; ABA therapy provided by RBT.

65. For the provision of services identified as Procedure Code 96152 U3 to IHCP members, Indiana Medicaid compensates providers Eleven and 60/100 ($11.60) per unit (15 minutes) of service rendered.

66. An RBT must practice under the close, ongoing supervision of a BCBA; this includes direct supervision of 5% - 20% of the total time of treatment received by the patient.

67. Direct supervision means both the BCBA and RBT are "in the room together" for some portion of the services rendered.

68. A BCBA's direct supervision of an RBT is not an initial assessment (identified and billed as Procedure Code 96150 U1) or re-assessment (identified and billed as Procedure Code 96151 U196151 UI).

69. A company providing ABA therapy services cannot bill for both the BCBA's time and the RBT's time during the periods of requisite direct supervision.

  **Speech Therapy**

70. The Indiana Health Coverage Programs (IHCP) reimburses for therapy services including but not limited to speech pathology services.

71. Speech pathology services are provided for IHCP members with speech, hearing, or language disorders. The services include diagnostic, screening, preventive, and corrective services.

72. Outpatient providers, such a HopeBridge, bill for speech pathology as stand-alone services.

73. The speech pathology services at issue herein are identified and billed as Procedure Code 92507; for which IHCP reimburses at a flat, statewide fee on a *per-hour basis* or per "unit" billed; one unit representing one hour of rendered services.

74. For the provision of services identified as Procedure Code 92507 to IHCP members, Indiana Medicaid compensates providers Fifty-Seven and 88/100 Dollars ($57.88) per unit (one hour) of service rendered.

75. Outpatient providers of speech pathology cannot bill for fractional units of less than one hour. *See Medicare and Medicaid Programs: Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 66 Fed. Reg. at 888.

76. In accordance with 405 IAC 5-22-6(b), the following criteria for prior authorization of speech pathology services:

A. When a member is enrolled in therapy, ongoing evaluations to assess progress and redefine therapy goals are part of the therapy program. The IHCP does not separately reimburse for ongoing evaluations.

*B. One hour of billed therapy must include a minimum of 45 minutes of direct patient care, with the balance of the hour spent in related patient services.*

  C. The IHCP does not prior authorize requests for therapy that duplicate other services provided to a patient.

77. A speech pathology session must be completed in a single day in order to be billed for a particular date of service.

## FACTUAL ALLEGATIONS
### Speech Pathology Services

78. HopeBridge is a provider of speech pathology services identified and billed to Indiana Medicaid under Procedure Code 92507.

79. HopeBridge maintains a waitlist for IHCP members seeking to obtain speech pathology services.

80. HopeBridge maintains a separate, longer, waitlist for patients in need of speech pathology services who have private insurance.

81. HopeBridge gives servicing priority to IHCP members in need of speech pathology services due to the favorable reimbursement rate it receives from Indiana Medicaid for providing it.

82. At all times prior to October of 2018, HopeBridge maintained a pattern and practice of only offering speech pathology services to IHCP members in thirty (30) minute, once a week intervals.

83. At all times prior to October of 2018, HopeBridge maintained a pattern and practice of only providing speech pathology services to IHCP members in thirty (30) minute, once a week intervals.

84. At all times prior to October of 2018, HopeBridge maintained a pattern and practice of not providing IHCP members receiving speech pathology services the requisite 45 minutes of direct care required by the Indiana Providers Manual.

85. Nonetheless, at all times prior to October of 2018, HopeBridge maintained a pattern and practice of billing Indiana Medicaid, using Procedure Code 92507, for one (1) unit of time (i.e., one hour of time) for every thirty (30) minute, once a week interval of speech pathology service it provided to IHCP members.

## FACTUAL ALLEGATIONS (Cont.)
### ABA Therapy Services

86. HopeBridge is a provider of ABA therapy services identified and billed to Indiana Medicaid under Procedure Codes 96150 U1, 96151 U1, and 96152 U3.

87. HopeBridge maintains a pattern and practice of billing, or receiving compensation, for both their BCBA's time and their RBTs time during periods of requisite direct supervision.

88. HopeBridge maintains a pattern and practice of billing, or receiving compensation for, their BCBA's time during periods of requisite direct supervision by characterizing the services rendered as re-assessments.

89. As set forth above, initial assessments and re-assessments do not require PA.

90. Assessment are reimbursed at a more favorable rate than

91. By characterizing the time and services at issue as a re-assessment, instead of the provision of direct care using Procedure Code 96152 U1, HopeBridge has been able to bill, and receive payment for, simultaneous services it would not have been able to otherwise.

92. By characterizing the time and services at issue as a re-assessment, instead of the provision of direct care using Procedure Code 96152 U1, HopeBridge has been able to bill, and receive payment for, services at a higher rate of reimbursement then it was entitled.

**COUNTS I & II: Violation of the Indiana False Claims and Whistleblower Protection Act**

93. Relator realleges and reincorporates paragraphs 1-92 of this Complaint as if fully set forth herein.

94. Ind. Code 5-11-5.5-2 provides liability for any person who-

   (1) presents a false claim to the state for payment or approval;

   (2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

   (3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

   (4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

   (5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

   (6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state.

95. HopeBridge violated 5-11-5.5-2 and knowingly caused false claims to be made, used and presented to the State of Indiana by their violation of federal and state laws as described herein.

96. The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, and unaware of HopeBridge's fraudulent and illegal practices, paid the claims submitted by HopeBridge in connection therewith.

97. Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein with an implied and express condition of payment of claims submitted to the State of Indiana in connection with HopeBridge's fraudulent and illegal practices.

98. Had the State of Indiana known that HopeBridge was violating the federal and state laws cited herein by billing assessments/ re-assessments so to circumvent the PA process and receive compensation for both their BCBA's and RBT's time during simultaneous periods of care and direct supervision, it would not have paid the claims submitted by HopeBridge in connection with the fraudulent and illegal acts.

99. Alternatively, had the State of Indiana known that HopeBridge violated the billing requirements cited herein by billing assessments/re-assessments to circumvent the PA process, maximize its reimbursement, and/or receive compensation for both their BCBA's and RBT's time during simultaneous periods of care and direct supervision, it would demand those funds be returned.

## COUNT III:
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A)
### (Billing For Services Not Rendered)

100. Relator realleges and incorporates by reference the allegations of paragraphs 1-92 above as though fully set forth herein.

101. Hopebridge developed, implemented, and continue to engage in a fraudulent scheme whereby it and its agents, servants and/or employees knowingly and falsely bill Indiana Medicaid, a program partially funded by the United States of America, for ABA therapy services (re-assessments) they do not render.

## COUNT IV: FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)
### (Reverse False Claims)

102. Relator realleges and incorporates by reference the allegations of paragraphs 1-92

above as though fully set forth herein.

103. In performing the acts described above, HopeBridge through its own acts or through the acts of its officers or agents, knowingly used false records and statements to conceal the obligation to pay, repay, or transmit money, in violation of 31 U.S.C. §3729(a)(1)(G).

104. Through HopeBridge's actions of improperly retaining funds to which they are not entitled, the United States has been deprived of the use of these monies and is entitled to damages in an amount to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Relator Bradley Stephens requests that judgment be entered against HopeBridge, LLC, ordering that:

105. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729-33 and the Indiana False Claims and Whistleblower Act;

106. Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of the Defendants' actions;

107. Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

108. Relator be awarded reimbursement for all costs of this action, including attorney's fees and expenses pursuant to 31 U.S.C. § 3730(d); and

109. The United States of America, the State of Indiana, and Relator Bradley Stephens recover such other relief as the Court deems just and proper.

Dated: 12/3/18

Respectfully Submitted,

_[signature]_

Travis W. Cohron, No. 29562-30
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
tcohron@clarkquinnlaw.com
*Counsel for the Relator, Bradley Stephens*